1
2
3
4
5
6
**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**
7
8
9   PHILLIP J. LYONS,                 )        3:07-cv-0460-LRH (RAM)
                                      )
10              Plaintiff,            )        **REPORT AND RECOMMENDATION**
                                      )        **OF U.S. MAGISTRATE JUDGE**
11        vs.                         )
                                      )
12   CONNIE BISBEE, et al.,           )
                                      )
13              Defendants.           )
     _____)
14

15          This Report and Recommendation is made to the Honorable Larry R. Hicks, United

16   States District Judge. The action was referred to the undersigned Magistrate Judge pursuant

17   to 28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR IB 1-4. Before the court is

18   Defendants' Motion for Summary Judgment. (Doc. #161.)[1] Plaintiff has opposed (Doc. #168),

19   and Defendants have replied (Doc. # 172). After a thorough review, the court recommends

20   that Defendants' motion be granted, in part, and denied, in part, as set forth below.

     ## I. BACKGROUND
21

22          At the time of the events underlying his allegations, Plaintiff was in custody of the

23   Nevada Department of Corrections (NDOC) as an inmate at Nevada State Prison (NSP) and

24   Lovelock Correctional Center (LCC). (Pl's Am. Compl. (Doc. # 21).) Defendants are various

25   officials and employees of NDOC as well as members of the Nevada Board of Parole

26   Commissioners (Parole Board). (*Id.*) Plaintiff brings various claims related to the deprivation

27   of his civil rights under 42 U.S.C. § 1983. (*Id.*) Plaintiff seeks general, compensatory and

28          _____

            [1]      Refers to the court's docket number.

1    punitive damages, injunctive and declaratory relief, as well as attorney's fees and legal costs.

2    (*Id*.)

3                                    **II.  LEGAL STANDARD**

4            The purpose of summary judgment is to avoid unnecessary trials when there is no

5    dispute over the facts before the court.  *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*,

6    18 F.3d 1468, 1471 (9th Cir.  1994) (citation omitted).  All reasonable inferences are drawn in

7    favor of the non-moving party.  *In re Slatkin*, 525 F.3d 805, 810 (9th Cir.  2008)(citing

8    *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).  Summary judgment is

9    appropriate if "the pleadings, the discovery and disclosure materials on file, and any affidavits

10   show that there is no genuine issue as to any material fact and that the movant is entitled to

11   judgment as a matter of law." *Id.*  (quoting Fed.R.Civ.P. 56(c)).  Where reasonable minds

12   could differ on the material facts at issue, however, summary judgment is not appropriate.

13   *Warren v.  City of Carlsbad*, 58 F.3d 439, 441 (9th Cir.  1995).

14           The moving party bears the burden of informing the court of the basis for its motion,

15   together with evidence demonstrating the absence of any genuine issue of material fact.

16   *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Although the parties may submit evidence

17   in an inadmissible form, only evidence which might be admissible at trial may be considered

18   by a trial court in ruling on a motion for summary judgment.  Fed.R.Civ.P. 56(c).

19           In evaluating the appropriateness of summary judgment, three steps are necessary: (1)

20   determining whether a fact is material; (2) determining whether there is a genuine issue for

21   the trier of fact, as determined by the documents submitted to the court; and (3) considering

22   that evidence in light of the appropriate standard of proof. *Anderson*, 477 U.S. at 248.  As to

23   materiality, only disputes over facts that might affect the outcome of the suit under the

24   governing law will properly preclude the entry of summary judgment; factual disputes which

25   are irrelevant or unnecessary will not be considered.  *Id.*

26           In determining summary judgment, a court applies a burden shifting analysis.  "When

27   the party moving for summary judgment would bear the burden of proof at trial, 'it must come

28                                              2

1   forward with evidence which would entitle it to a directed verdict if the evidence went

2   uncontroverted at trial.' In such a case, the moving party has the initial burden of establishing

3   the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp.*

4   *Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000)(citations omitted).

5   In contrast, when the nonmoving party bears the burden of proving the claim or defense, the

6   moving party can meet its burden in two ways: (1) by presenting evidence to negate an

7   essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving

8   party failed to make a showing sufficient to establish an element essential to that party's case

9   on which that party will bear the burden of proof at trial. *See Celotex*, 477 U.S. at 323-24. If

10  the moving party fails to meet its initial burden, summary judgment must be denied and the

11  court need not consider the nonmoving party's evidence. *See Adickes v. S.H. Kress & Co.*, 398

12  U.S. 144, 159-60 (1970).

13          If the moving party satisfies its initial burden, the burden shifts to the opposing party

14  to establish that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v.*

15  *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a factual dispute,

16  the opposing party need not establish a material issue of fact conclusively in its favor. It is

17  sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the

18  parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec.*

19  *Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987)(citation omitted). In other words, the

20  nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations

21  that are unsupported by factual data. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989)

22  (citation omitted). Instead, the opposition must go beyond the assertions and allegations of

23  the pleadings and set forth specific facts by producing competent evidence that shows a

24  genuine issue for trial. *See* Fed.R.Civ.P. 56(e); *Celotex*, 477 U.S. at 324.

25          At summary judgment, a court's function is not to weigh the evidence and determine

26  the truth but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S.

27  at 249. While the evidence of the nonmovant is "to be believed, and all justifiable inferences

28

3

1
2
3

4

5

6

7
8
9
10
11
12
13
14
15
16
17
18

19
20
21
22
23
24
25

26

27

28

are to be drawn in its favor," if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *Id*. at 249-50, 255 (citations omitted).

### III.  DISCUSSION

**A.    STATUTE OF LIMITATIONS**

    **1.    Summary of Argument**

Defendants contend that Counts I-V and VII are barred by the statute of limitations. (Defs.' Mot for Sum.  J. (Doc. # 161) 12-17.)  First, Defendants argue that Plaintiff's April 12, 1991 pre-sentence investigation report (PSI), addressing a sexual assault charge for which Plaintiff was not convicted, provided him with notice that he would be classified as a sex offender for parole purposes.  (Doc. # 161 14.)  Second, Defendants argue that Plaintiff had notice he was being classified as a sex offender for parole purposes because  his 1995 parole progress report contains the sexual assault charge allegations.  (*Id.* at 14-15.)  Third, Plaintiff contested the 1995 parole denial based, at least in part, on the reference to the sexual assault charge.  (Doc. # 161 Ex.  A at Attachment 4, Defs.' Reply (Doc. # 172) 4.)  Finally, Plaintiff requested a review of his sex offender status in 1999.  (Doc. # 161 15.)  Defendants assert that Counts I-V and VII are all related to facts and circumstances that were apparent as early as 1991, and are therefore barred by the statute of limitations.  (*Id.*  at 16-17.)

Plaintiff disputes Defendants' contention that he knew or should have known that he was being classified as a sex offender as early as 1991.  (Pl.'s Opp.  to Defs.' Mot.  for Sum. J. (Doc. # 168) 15, Ex.  1 at ¶¶ 7, 14.)[2]  First, Plaintiff admits that the 1991 PSI contained information concerning the sexual assault charge, but argues this did not suggest that Plaintiff had been classified as a sex offender for parole purposes.  (Doc. # 168 17.)  Second, Plaintiff asserts that just because NDOC included the sex offense allegations in his 1995 parole progress report does not establish that Plaintiff was aware or should have been aware he was being

[2]    For Plaintiff's Opposition, all page number references are to the page numbers of the opposition and not the court's docket page numbers.

4

1   classified as a sex offender at that time.  (*Id.* at 18-20.)  Third, Plaintiff admits he submitted

2   a 1995 letter of appeal to the Parole Board based on the fact that the panel referenced the sex

3   offense allegations, but he denies this establishes he knew or should have known that NDOC

4   was treating him as a sex offender at that time.  (*Id.*)  Finally, Plaintiff denies requesting

5   review of his sex offender classification status in 1999.  (*Id.* at 23.)  In sum, Plaintiff claims

6   he was not aware, and had no reason to be aware of his sex offender status until at least 2006,

7   and therefore Counts I and II are not barred by the statute of limitations.  (*Id.*)  With respect

8   to Counts III, IV, V, and VII, he argues that they are not barred by the statute of limitations

9   because they stem from events occurring in 2007.  (*Id.* at 24.)

10              **2.    Standard**

11          Section 1983 does not contain its own statute of limitations.  Therefore, the federal

12   courts borrow the statute of limitations for § 1983 claims applicable to personal injury claims.

13   *Wilson v.  Garcia,* 471 U.S. 261, 279-80 (1985); *Johnson v.  State of California,* 207 F.3d 650,

14   653 (9th Cir.  2000) (citation omitted).  In Nevada, the statute of limitations for personal

15   injury actions is two years.  Nev.  Rev.  Stat. § 11.190(4)(e); *Perez v.  Seevers*, 869 F.2d 425,

16   426 (9th Cir.  1989).  Therefore, the statutory period for bringing a § 1983 action is two years

17   as well.  "Federal law determines when a cause of action accrues and the statute of limitations

18   begins to run for a § 1983 claim." *Bagley v.  CMC Real Estate Corp.*, 923 F.2d 758, 760 (9th

19   Cir.  1991) (citation omitted).  Under federal law, a cause of action accrues when the plaintiff

20   "knows or has reason to know of the injury which is the basis of the action." *Id.*  (internal

21   quotation marks and citations omitted).

22              **3.    Analysis**

23          First, Defendants rely on Plaintiff's 1991 PSI which contains the dismissed sexual

24   assault charge allegations.  (Doc. # 161 14, Ex A at Attachments 1 and 2.)  While Plaintiff

25   acknowledges the PSI contained information concerning the sex offense, this does not

26   establish that Plaintiff knew he was being classified as a sex offender for parole purposes at

27   that time. Second, Defendants rely on the parole progress report from 1995, which references

28                                            5

the dismissed sexual assault charge. (Doc. # 161 14, Ex. A at Attachment 3.) While Plaintiff acknowledges that the allegations of the charge were mentioned in the parole progress report, the court finds this document alone does not conclusively establish Plaintiff knew he was being classified as a sex offender for parole purposes at that time. Third, the parties reference Plaintiff's September 1995 correspondence, expressing his dissatisfaction with the 1995 parole board determination because of references to the dismissed sexual assault charge. (Doc. # 161 Ex. A at Attachment 4, Doc. # 168 18-20, Doc. # 172 4.) In this correspondence, Plaintiff unequivocally asserts that the sexual assault charge was a major issue at his parole hearing in 1995, and explicitly recognizes that the dismissed sex offense will continue to be a factor in future parole hearings and classification committee hearings. (Doc. # 161 Ex. A at Attachment 4.) Finally, Defendants contend Plaintiff requested a review of his sex offender status in 1999, while Plaintiff denies he made such a request. (Doc. # 161 15 and Doc. # 168 23.) Plaintiff's denial is belied by the record which contains a copy of NDOC's Offender Information Summary pertaining to Plaintiff, specifically noting Plaintiff requested a review of his sex offender status in 1999. (Doc. # 161 15, Ex. K.)

While the facts and evidentiary ambiguities are to be construed in Plaintiff's favor, there is no ambiguity regarding Plaintiff's September 1995 correspondence attacking his parole determination because of the reference to the dismissed sexual assault charge. Likewise, there is no ambiguity concerning Plaintiff's 1999 request for a review of his sex offender status. Plaintiff has produced no evidence, other than his self-serving statement, to refute the documentary evidence produced by Defendants showing that Plaintiff requested a review of his sex offender status in 1999 and his unequivocal statement that the sex offense played a major part in his 1995 parole determination. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)(footnote omitted)). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported

1   motion for summary judgment; the requirement is that there be no *genuine* issue of *material*

2   *fact*." *Id*. (internal quotations omitted) (citing *Anderson*, 477 U.S. at 247-48)(emphasis

3   original).   Moreover, "[w]hen opposing parties tell two different stories, one of which is

4   blatantly contradicted by the record, so that no reasonable jury could believe it, a court should

5   not adopt that version of the facts for purposes of ruling on a motion for summary judgment."

6   *Scott*, 550 U.S. at 380.  The Ninth Circuit "has refused to find a 'genuine issue' where the only

7   evidence presented is 'uncorroborated and self-serving' testimony." *Villiarimo v. Aloha Island*

8   *Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (citations omitted).  Therefore, Plaintiff has not

9   met his burden of establishing a genuine issue of material fact; he has not produced evidence

10  so that a jury could reasonably find that he did not have knowledge of his sex offender status

11  at least as of 1995.  *See Anderson*, 477 U.S. at 252.

12         In Count I, Plaintiff alleges that Defendants Bayer, Angelone, Crawford, Whorton, and

13  Skolnik established or maintained a policy, practice or custom that allowed NDOC officials to

14  classify and label Plaintiff as a sex offender based on a charge that was dismissed.  (Doc. # 21

15  26.)  He alleges that Defendants Grafton, Donat, Baca and Schlottman deprived him of his due

16  process and equal protection rights when they denied his grievances, maintaining the sex

17  offender classification despite their knowledge he was not convicted of a sex offense.  (*Id*. at

18  26-27.)   This claim accrued when Plaintiff knew or should have known of his sex offender

19  status, which the court finds was as early as 1995.  Therefore, Count I is barred by the statute

20  of limitations.

21          In Count II, Plaintiff alleges that Defendant Angelone, former director of NDOC,

22  established, maintained, required, or permitted a policy, practice or custom that allowed

23  NDOC officials to classify Plaintiff as a sex offender by transferring him to LCC in 1998, an

24  institution he alleges was primarily designated for housing sex offenders. (*Id*. at 29.) Plaintiff

25  alleges the transfer took place in 1998 and he knew of his sex offender status at that time.

26  Therefore, Count II is barred by the statute of limitations.

27         In Count III, Plaintiff alleges Defendant Keith violated his due process and equal

28

protection rights when he presented the Parole Board with a report in 2007, falsely accusing Plaintiff of sexual assault despite the fact that Plaintiff was never convicted of the sex offense. (Doc. # 21 31 and Doc. # 168 25.) Plaintiff asserts that the Parole Board relied heavily on these facts and they were the main factor in the decision to render a three-year parole denial. (*Id.*) Plaintiff asserts that Defendant Keith refused to delete the sex offense accusations from the parole report or to add the facts that the charge had been dismissed. (*Id.* at 31-32.) Plaintiff alleges that Defendants Keith, Baca, Donat, Cox, Schlottman, and Smith violated his rights when they denied his grievances on this issue. (*Id.* at 31.) Unlike Counts I and II, the court finds that this claim accrued in 2007, and the statute of limitations does not bar Count III.

In Count IV, Plaintiff alleges that Defendants Bisbee, Goodson, and Vieth violated his rights when they initiated or permitted discussion of the dismissed sex offense at Plaintiff's hearing in April 2007, without placing the issue on the agenda and without giving Plaintiff prior notice that the issue would be discussed at the hearing, in violation of Nevada's Open Meeting Law. (*Id.* at 33.) Like Count III, the court finds Count IV accrued in 2007, and is not barred by the statute of limitations.

In Count V, Plaintiff alleges that Defendants Bisbee, Goodson, and Vieth violated his rights when they treated him as a sex offender and gave him a three-year parole denial in 2007 in retaliation for a dismissed sex offense. (Doc. # 21 35.) The court finds that Count V accrued in 2007, and is not barred by the statute of limitations.[3]

In Count VII, Plaintiff alleges that Defendant Salling, Chairperson of the Parole Board, violated his rights by establishing or maintaining a policy, practice, or custom that allowed Defendants Bisbee, Goodson, and Vieth to evaluate Plaintiff for parole consideration as a sex offender when he was not convicted of a sex offense, resulting in a three-year parole denial in 2007. (Doc. # 21 39-40.) The court finds that Count VII accrued in 2007, and is not barred by the statute of limitations.

---

[3]     The court previously ordered judgment entered in favor of the Parole Board members on Plaintiff's claims for damages and injunctive relief in Counts IV, V, VI, and XII. (*See* Doc. # 108 and Doc. # 116.)

8

1    In sum, Counts I and II are barred by the statute of limitations and Counts III, IV, V

2    and VII are not.

3    **B.    COUNT VI**

4        **1.    Summary of Argument**

5        Defendants argue that Plaintiff cannot provide factual support for the claims in Count

6    VI, wherein he claims that the Parole Board tends to deny parole in longer intervals for

7    inmates incarcerated in prisons located in the northern part of the state and to those of

8    African-American descent. (Doc. # 161 17-19.) Defendants contend that parole decisions are

9    made on a case-by-case basis, and not based on the inmate's location or race. (*Id*.)

10        Plaintiff argues that Defendants have not given an explanation for the decision to give

11    Plaintiff a three-year parole denial. (Doc. # 168 27.) Plaintiff reiterates that it is his belief that

12    prisoners housed in the southern region have a better chance of being paroled or receiving less

13    harsh parole denials than those housed in the northern region. (*Id*. at 28.) Plaintiff argues

14    that when he appeared before the parole board in 1995 and 2001, it was comprised of a racially

15    diverse panel, however, when he appeared in April 2007, there were no minorities on the

16    panel. (*Id*. at 35-36.) In addition, Plaintiff contends that a white inmate that appeared before

17    the same parole board, with less favorable standing, was granted parole while he was denied

18    parole. (*Id*. at 37-38.)

19        **2.    Race Discrimination**

20        The Fourteenth Amendment provides that states may not deny persons the equal

21    protection of the laws. U.S. Const. amend. XIV. Inmates "are protected under the Equal

22    Protection Clause of the Fourteenth Amendment from invidious discrimination based on

23    race." *Wolff v. McDonnell*, 418 U.S. 539, 555 (1974) (citation omitted); *Walker v. Gomez*,

24    370 F.3d 969, 973 (9th Cir. 2004). To state a viable equal protection claim, Plaintiff "must

25    show that the defendant acted with an intent or purpose to discriminate against him based

26    upon his membership in a protected class." *Serrano v. Francis*, 345 F.3d 1071, 1082 (9th Cir.

27    2003)(citation omitted). "Intentional discrimination means that a defendant acted at least

28                                                    9

in part because of a plaintiff's protected status." *Id*. (citation omitted).   This case does not involve a race-based policy.   Instead, it involves race-neutral parole board determinations which Plaintiff asserts were racially motivated when he was given a three-year parole denial in 2007. "To avoid summary judgment, [plaintiff] 'must produce evidence sufficient to permit a reasonable trier of fact to find by a preponderance of the evidence that the decision was racially motivated.'" *Serrano*, 345 F.3d at 1082 (citations and alterations omitted).

Here, Defendants maintain that Plaintiff has not demonstrated any evidence of discriminatory intent, and the court agrees.  Plaintiff states in his opposition that he believes the three-year parole denial was race-based, but the only support he provides for this claim is his self-serving statement that there were no minorities on his parole board panel in 2007, and that a former white inmate, John Hall, with less favorable standing, was granted parole while Plaintiff was not.  (Doc. # 168 35-38.)  Notably, Plaintiff testified in deposition that "[i]t's difficult for [him] to actually say that they denied me a parole based on race." (Doc. # 161 Ex. B at 76:24-25, 77:1-3.)  He simply speculates that because Mr. Hall got paroled and he did not, when he believed his disciplinary record was better than Mr. Hall's, that there had to be another reason for his parole denial. (*Id*. at 77: 3-13, 23-25.) Plaintiff has not produced any evidence that Defendants treated inmates of other races differently from Plaintiff. Plaintiff's speculation that he was denied parole on the basis of his race is insufficient to raise a triable issue of material fact on the issue of discriminatory intent. *See Nelson v. Pima Community College*, 83 F.3d 1075, 1081-82 (9th Cir. 1996) ("mere allegation and speculation do not create a factual dispute for purposes of summary judgment") (citation omitted); *see also Champion v. Murphy*, 643 F.Supp.2d 1171 (C.D. Cal. 2009)(court found "Plaintiff's speculation that Defendant's allegedly improper dental care or Defendant's alleged 'smirks' and 'smugness' were the product of discriminatory intent" were not sufficient to raise triable issue).  In addition, evidence that a plaintiff and defendant are of difference races, combined with a disagreement as to the reasonableness of the defendant's conduct toward the plaintiff is alone insufficient to show an equal protection violation. *Bingham v. City of Manhattan*

10

*Beach*, 341 F.3d 939, 948 (9th Cir. 2003), *overruled on other grounds*, *Edgerly v. City & County of San Francisco*, 599 F.3d 946, 956 n. 14 (9th Cir. 2010); *see also Thornton v. City of St. Helens*, 425 F.3d 1158, 1167 (9th Cir. 2005). Plaintiff has not provided evidence that reasonably indicates racial discrimination in violation of the Equal Protection Clause. Therefore, summary judgment should be granted as to this claim.

### 3.   Geographical Discrimination

Where state action "does not implicate a fundamental right or suspect classification, the plaintiff can establish a 'class of one' equal protection claim by demonstrating that [he] 'has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.'" *Squaw Valley Dev. Co. v. Goldberg*, 375 F.3d 936, 944 (9th Cir. 2004), *overruled on other grounds by Shanks v. Dressel*, 540 F.3d 1082, 1087 (9th Cir. 2008). Thus, Defendants need only articulate a legitimate governmental interest that is rationally related to its policy. *See, e.g., McGinnis v. Royster*, 410 U.S. 263 (1973). As stated above, Plaintiff must still show that Defendants intentionally discriminated against him based upon geographic location. *Serrano*, 345 F.3d at 1082.

Plaintiff claims that prisoners housed in the southern region of the state have a better chance of being paroled or receiving less harsh parole denials than those housed in the northern region. Plaintiff states that it is his belief that such a disparity exists, and he also relies on parole statistics for years 2000 to 2002, produced in discovery. (Doc. # 168 28-30.) Plaintiff also asserts that when he appeared before the Parole Board in the southern region he received a one-year parole denial, but when he appeared before the northern region, he received a three-year parole denial. (Doc. # 161 Ex. B at 82:3-12.)

Defendants submit the declaration of David Smith, Parole Hearings Examiner II. (Doc. # 161 Ex. I at ¶ 1.) Defendants provide parole decisions from January 1, 2000 to December 2002, according to region. (*Id.* at ¶ 5, Attachment 1.) The Parole Board stopped compiling these statistics by region after 2002 because they began videoconferencing procedures. (*Id.* at ¶ 6.) Based on Mr. Smith's training and experience, an inmate's geographic location is not

1    and has never been one of the criteria used in making a determination to grant or deny parole.

2    (*Id*. at ¶ 10.)  Instead, any statistical disparity between regions may be due to the type of

3    correctional facilities that house different custody levels in the region.  (*Id*. at ¶ 12.)  By way

4    of example, he states that Ely State Prison is a maximum custody facility, and the number of

5    parolees are less when compared with medium level facilities.  (*Id*.)

6          Defendants provided a supplemental declaration of Mr.  Smith in support of their

7    reply.  (Doc. # 172-1.)  For the period of 2000 to 20002, the parole hearing statistics compiled

8    from quarterly reports dealing with discretionary hearing statistics, like Plaintiff's, reflect that

9    out of 7,273 discretionary parole hearings held in the north, a total of 3,708, or 51%, of

10   discretionary paroles were denied by the northern panel. (Doc. # 172-1 at ¶ 4.)  Out of a total

11   of 7,239 discretionary parole hearings held in the south, a total of 3,518, or 48.6%,

12   discretionary paroles were denied by the southern panel.  (*Id*.)  Out of the 3,708 discretionary

13   denials by the northern panel during that period, 528 of those were within the discretionary

14   parole guideline that suggested parole should be granted; however, those inmates were denied

15   based on factor(s) deemed relevant by the panel.  (*Id*.  at ¶ 5.)  Out of the 3,518 discretionary

16   denials by the southern panel during the same time period, 609 of the denials were within the

17   discretionary guideline that suggested parole should be granted; however, these inmates were

18   denied based on factor(s) deemed relevant by the panel.  (*Id*. at ¶ 6.)  The statistics show that

19   for 2000 to 2002, the south denied parole to inmates who were eligible for parole within the

20   discretionary parole guideline at a slightly higher rate than the north.  (*Id*. at ¶ 7.)  The court

21   agrees with Defendants that these statistics are not evidence of a policy, practice or custom of

22   denying parole to inmates housed in the northern region of the state.  When coupled with Mr.

23   Smith's statement that geographic location has no bearing on a parole decision, the court finds

24   there is no evidence of intent to discriminate against Plaintiff based on his geographic location.

25   Therefore, summary judgment should be granted as to this claim.

26   / / /

27

28                                        12

**C.      COUNT VII**

In Count VII, Plaintiff alleges Defendant Salling, Chairperson of the Parole Board, permitted a policy, practice, or custom that permitted the Parole Board to treat Plaintiff as a sex offender for purposes of his parole hearings, resulting in a three-year parole denial. (Doc. # 21 39-40.)  Plaintiff also asserts that the three-year parole denial was retaliatory because Plaintiff had a dismissed sex charge and had not taken part in any sex offender programs. (*Id.* at 40.)

While the court has determined Count VII is not barred by the statute of limitations, the only defendants specifically mentioned in Count VII are Parole Board members Salling, Bisbee, Goodson, and Vieth.  (Doc. # 21 39-42.)  The court has already determined that the Parole Board members are entitled to absolute immunity from claims for monetary and injunctive relief pled against them in this action. (*See* Doc. # 108 12-14, Doc. # 116.)  While the order granting the Nevada Parole Board members absolute immunity only referred to Counts IV, V, VI and XII, the court finds that these Defendants are entitled to absolute immunity in Count VII for the same reasons asserted in the court's prior order. (*See* Doc. # 108 12-14, Doc. # 116.)  Accordingly, summary judgment should be granted as to Count VII.

**D.      COUNT VIII**

In Count VIII, Plaintiff alleges that Defendant Whorton retaliated against him by failing to expunge his prison files and refusing to transfer him back to the southern region after he was successful in  a lawsuit against NDOC (CV-N-03-0577-HDM-RAM). (Doc. # 21 42-43.)

First, Defendant Whorton contends that he was not required to expunge the files or transfer Plaintiff back to the southern region under the terms of the settlement agreement in Plaintiff's prior case. (Doc. # 161 20.)  Second, Defendant Whorton contends that Plaintiff is really complaining about NDOC's refusal to transport him to the correctional facility of his choosing, and he has no constitutional right to be housed in a particular prison. (*Id.*)  Third, Defendant Whorton argues that Plaintiff has not alleged his actions have resulted in a chilling effect on Lyons's exercise of his First Amendment rights. (*Id.* at 21.)  Lastly, he contends there

1    is no evidence he participated in any constitutional violation, other than possibly

2    corresponding with members of Plaintiff's family.  (*Id.*)

3           A plaintiff may state a claim for a violation of his First Amendment rights due to

4    retaliation under 42 U.S.C. § 1983. *Pratt v. Rowland*, 65 F.3d 802, 806 (9th Cir. 1995). Such

5    a claim consists of five elements: "(1) An assertion that a state actor took some adverse action

6    against an inmate (2) because of (3) that prisoner's protected conduct, and that such action

7    (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not

8    reasonably advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567-

9    68 (9th Cir. 2005) (citations omitted).  The inmate must (1) submit evidence, either direct or

10   circumstantial, to establish a link between the exercise of constitutional rights and the

11   allegedly retaliatory action, and (2) demonstrate that his or her First Amendment rights were

12   actually chilled by the alleged retaliatory action.  *Pratt*, 65 F.3d at 806-07.  Timing of the

13   events surrounding the alleged retaliation may constitute circumstantial evidence of

14   retaliatory intent. *See Sorrano's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1316 (9th Cir. 1989).

15   The Ninth Circuit has recognized that prisoners have a fundamental First Amendment right

16   to file prison grievances and pursue civil rights litigation, and "because purely retaliatory

17   actions taken against a prisoner for having exercised those rights necessarily undermine those

18   protections, such actions violate the Constitution quite apart from any underlying misconduct

19   they are designed to shield." *Rhodes*, 408 F.3d at 567 (citation omitted).

20          To obtain summary judgment on a claim of retaliation, the defendant has the initial

21   burden to demonstrate there are no genuine issues of material fact supported by evidence as

22   to at least one of the essential elements of a retaliation claim, and, as a result, the plaintiff

23   cannot prevail on the claim. *Celotex*, 477 U.S. at 323.  "The plaintiff bears the burden of

24   pleading and proving the absence of legitimate correctional goals for the conduct of which he

25   complains." *Pratt*, 65 F.3d at 806.  In analyzing a retaliation claim, a court should "afford

26   appropriate deference and flexibility to prison officials in the evaluation of proffered legitimate

27   penological reasons for conduct alleged to be retaliatory."  *Id.* at 807 (internal quotation

28                                                     14

1   marks and citation omitted).

2        Plaintiff admits that Defendant Whorton never told him he was not being transferred

3   back to the southern region because he won a lawsuit against NDOC. (Doc. # 161 Ex. B at

4   97:4-19.) Plaintiff concedes that the jury did not award him the right to have his files

5   expunged or to be transferred back to the southern region when he was successful in his

6   previous lawsuit against NDOC. (Doc. # 161 Ex. B. at 99-104.) The court has reviewed the

7   settlement agreement and it does not provide Plaintiff with a right to be transferred to the

8   southern region or to have his files expunged. (*See* Doc. # 161 Ex. L.)

9        The court finds that there is simply no evidence that Defendant Whorton took adverse

10  action, in the form of denying Plaintiff's transfer to the southern region and refusing to

11  expunge his files, *because* Plaintiff was successful in a prior lawsuit against NDOC. Plaintiff's

12  mere speculation that this is the case is not enough to raise a genuine issue of material fact.

13  *See Nelson v. Pima Community College*, 83 F.3d 1075, 1081-82 (9th Cir. 1996) ("mere

14  allegation and speculation do not create a factual dispute for purposes of summary judgment")

15  (citation omitted). Nor has Plaintiff provided circumstantial evidence from which retaliation

16  could be inferred. Accordingly, summary judgment should be granted as to Count VIII.

17  **E.    COUNT IX**

18       Plaintiff alleges that Defendant Hyde directed and ordered NDOC transportation

19  officers to carry out a strip search whereby Plaintiff and other inmates were stripped

20  completely naked on the tier and were forced to bend over and spread their buttocks in view

21  of other inmates and staff who were not involved in conducting the search. (Doc. # 21 44.)

22  Plaintiff asserts that the search could have been performed in a number of less populated,

23  private areas, including the nearby shower room, activity room, or gymnasium. (*Id.*, Doc. #

24  168 7, 47.) Plaintiff further alleges that a female officer was permitted to be present on the tier

25  during the search. (Doc. # 21 45.) He asserts that Defendants Whorton and Cox, as directors,

26  established or permitted this policy. (*Id.*)

27       Defendants argue there is no evidence that they were deliberately indifferent to

28

15

1   Plaintiff's health or safety in connection with the alleged strip search, and the search was the

2   result of a departmental decision to transfer a large number of protective custody inmates to

3   LCC, known as a depopulation. (Doc. # 161 21-26.) Defendants argue that conducting the

4   search on the unit tier was justified because of safety, space, and logistical considerations

5   attendant to the depopulation. (*Id.* at 23-26.)

6         Plaintiff does not dispute that in May 2006, protective custody inmates assigned to NSP

7   were reassigned to LCC requiring LCC to depopulate the general population unit to make

8   room for the protective custody inmates being transferred to LCC. (Doc. # 161 8 at ¶ 34, Ex.

9   M at ¶¶ 6-8, Doc. # 168 2.) Administrative Regulation (AR) 430 and LCC Institutional

10  Procedure (IP) 4.59 require that an inmate submit to an unclothed body search any time he

11  is processed for transportation out of LCC. (Doc. # 161 at ¶ 35, Ex. M at ¶ 9, Ex. N, Ex. O,

12  and Doc. # 168 2.) Plaintiff does not dispute that ordinarily, inmates are not searched on the

13  tier or external to the prison; however, when a large group of inmates, such as a depopulation,

14  is being searched prior to being transported, it is the practice of transportation officers and/or

15  custodial staff to conduct the searches on the unit tier or in a secure location external to the

16  prison. (Doc. # 161 8 at ¶ 35, Ex. M at ¶ 10, Ex. N and Ex. O, Doc. # 168 2.) Plaintiff also

17  does not dispute that an unclothed body search consists of the following procedure: (1)

18  inmates to be searched are instructed to exit their cells clothed; (2) inmates face the wall; (3)

19  inmates, when instructed to do so, will remove their shirts, pants, socks and shoes, and

20  undershirts; (4) officers will check the removed clothing for contraband; (5) inmates will be

21  instructed to remove their boxer shorts and place them on the floor; (6) inmates are instructed

22  to bend over and cough; (7) inmates are instructed to lift their feet for inspection of the soles;

23  (8) inmates are instructed to turn around and face the officers; (9) facing the officers, inmates

24  run their fingers through their hair, through their mouth along the gums, lift their arms and

25  lift their scrotum; and (10) following completion of the visual search, the inmate is instructed

26  to redress. (Doc. # 161 9 at ¶ 36, Ex. B at 112:15-25, 113:1-6, Ex. M at ¶ 11, Doc. # 168 2.)

27

28

1            **1.     Eighth Amendment**

2          The Eighth Amendment prohibits the imposition of cruel and unusual punishment and

3   "embodies broad and idealistic concepts of dignity, civilized standards, humanity and

4   decency." *Estelle v. Gamble*, 429 U.S. 97 (1976) (internal quotation marks and citation

5   omitted). Under the Eighth Amendment, prison conditions should not "involve the wanton

6   and unnecessary infliction of pain" or be "grossly disproportionate to the severity of the crime

7   warranting imprisonment." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). Although prison

8   conditions may be, and often are, restrictive and harsh, prison officials "must ensure that

9   inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable

10  measures to guarantee the safety of the inmates.'" *Farmer v. Brennan*, 511 U.S. 825, 832

11  (1994) (quoting *Hudson v. Palmer*, 486 U.S. 517, 526-27 (1984)).

12         A prison official violates the Eighth Amendment only when two requirements are met:

13  (1) the objective requirement that the deprivation is "sufficiently serious," and (2) the

14  subjective requirement that the prison official has a "sufficiently culpable state of mind."

15  *Farmer*, 511 U.S. at 834 (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)).

16         First, "the deprivation alleged must be, objectively, sufficiently serious." *Farmer*, 511

17  U.S. at 834 (citations and quotations omitted). This means that the act or omission of a prison

18  official must "result in the denial of the minimal civilized measures of life's necessities." *Id*.

19  Second, the prison official must have acted with "deliberate indifference" to inmate health or

20  safety. *Id*. (internal quotation marks and citations omitted). A prison official acts with

21  deliberate indifference when he or she "knows of and disregards an excessive risk to inmate

22  health or safety." *Id*. at 837. "Mere negligence is not sufficient to establish liability." *Frost*

23  *v. Agnos*, 152 F.3d 1124, 1128 (9th Cir. 1998). Prison officials may avoid liability by: (1)

24  proving they were unaware of the risk, or (2) proving they "responded reasonably to the risk,

25  even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844.

26         The court finds that there is no evidence that Defendants violated Plaintiff's Eighth

27  Amendment rights in connection with the strip search. First, the court finds that Plaintiff has

28                                                                    17

not alleged an objectively, sufficiently serious deprivation.  Plaintiff does not allege physical injury as a result of the strip search, but instead asserts that he was degraded and humiliated. (Doc. # 168 45.)  Cases involving Eighth Amendment violations implicate more severe circumstances than those set forth here.  For example, in *Hudson v. McMillian*, 503 U.S. 1, 4 (1992), prison guards punched an inmate in the mouth, eyes, chest and stomach while another officer held him in place and kicked and punched him from behind.  In *Vaughan v. Ricketts*, 859 F.2d 736, 741 (9th Cir.  1988), prison officials were not entitled to qualified immunity on an Eighth Amendment claim where untrained medical assistants performed a digital rectal cavity search on an unsanitary table in view of other prison personnel. An Eighth Amendment violation was found in *Hoptowit v. Spellman*, 753 F.2d 779, 784 (9th Cir. 1985), where there was inadequate ventilation and airflow that undermined the health and safety of inmates.  In *Spain v.  Procunier*, 600 F.2d 189, 199 (9th Cir.  1979), an Eighth Amendment violation was found where prison officials completely denied exercise to some prisoners. Here, the strip search that occurred as part of a depopulation of inmates was plainly constitutional. Plaintiff does not challenge the prison's need to conduct the search as a matter of security. Rather, he takes issue with the search being performed on the tier, in view of other inmates and staff.   However, Defendants have asserted valid safety and logistical concerns that support the decision to conduct a search of a large number of inmates on the tier.  The court finds that Plaintiff fails to meet the objective prong of the Eighth Amendment inquiry because he has not shown a denial of the minimal civilized measures of life's necessities.

In addition, Plaintiff has failed to present evidence to satisfy the subjective component of his claim.  There is simply no indication that Defendants knew of and disregarded an excessive risk to Plaintiff's health or safety in conducting the search on the tier.  Plaintiff fails to demonstrate a genuine issue of material fact concerning his Eighth Amendment claim. Therefore, Defendants are entitled to summary judgment as to Plaintiff's Eighth Amendment claim in Count IX.

### 2. Fourth Amendment

To the extent Plaintiff asserts a Fourth Amendment violation in connection with the strip search, the court addresses that claim here.

The Ninth Circuit has held that the Fourth Amendment right of people to be secure against unreasonable searches and seizures "extends to incarcerated persons; however, the reasonableness of a particular search is determined by reference to the prison context." *Michenfelder v. Sumner*, 860 F.2d 328, 332 (9th Cir. 1988).  The Fourth Amendment prohibits unreasonable searches, and reasonableness is determined by the context, which requires a balancing of the need for the particular search against the invasion of personal rights that search entails. *Bell v. Wolfish*, 441 U.S. 520, 558-59 (1979) (quotations omitted); *Bull v. City and County of San Francisco*, 595 F.3d 964, 974-75 (9th Cir.  2010); *Nunez v. Duncan*, 591 F.3d 1217, 1227 (9th Cir.  2010); *Michenfelder*, 860 F.2d at 332-33.  The scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted must be considered. *Bell*, 441 U.S. at 559 (quotations omitted); *Bull*, 595 F.3d at 972; *Nunez*, 591 F.3d at 1227; *Michenfelder*, 860 F.2d at 332.

In evaluating whether a prison's policy or practice is reasonable under the Fourth Amendment, courts must also look to the test articulated in *Turner v.  Safely*, 482 U.S. 78, 89-91 (1987).   Under *Turner*, as applied to a Fourth Amendment body search claim, any infringement on a prisoner's Fourth Amendment rights must be reasonably related to legitimate penological interests; this requires consideration of: (1) whether there is a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it; (2) whether there are alternative means of exercising the right; (3) the impact the accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally; and (4) the absence of ready alternatives. *Turner*, 482 U.S. at 89-91; *Bull*, 595 F.3d at 973; *Nunez*, 591 F.3d at 1227; *Michenfelder*, 860 F.2d at 331. Not all four factors are applicable to every case. *Michenfelder*, 860 F.2d at 331 n. 1.  As noted in *Michenfelder* and *Bull*, the second *Turner* factor, whether

19

1    there are alternative means of exercising the right that remain open to prison inmates, *Turner*,

2    482 U.S. at 90, is not applicable to a search policy because "the right to be free from

3    unreasonable searches is not a right susceptible to exercise by alternative means." *Bull*, 595

4    F.3d at 973 n. 9 (citing *Michenfelder*, 860 F.2d at 331 n. 1).  In applying the *Turner* factors,

5    great deference must be given to prison officials' assessments of their interests because

6    "[p]rison administration is...a task that has been committed to the responsibility of [the

7    legislative and executive branches], and separation of powers concerns counsel a policy of

8    judicial restraint.  Where a state penal system is involved, federal courts have...additional

9    reason to accord deference to the appropriate prison authorities." *Michenfelder*, 860 F.2d at

10   331 (internal citations omitted).  Therefore, "in the absence of substantial evidence in the

11   record to indicate that the officials have exaggerated their response to [security and operation

12   considerations], courts should ordinarily defer to their expert judgment in such matters." *Bell*,

13   441 U.S. at 540 n.  23 (internal quotation marks and citation omitted).

14                    **a.  The *Bell* Balancing Test**

15                        **i.  Scope and Manner**

16        Viewing the facts in the light most favorable to Plaintiff, a search was conducted

17   whereby Plaintiff and other inmates were forced to bend over and spread their buttocks in

18   view of other inmates and staff who were not involved in conducting the search.  (Doc. # 21

19   44.) Defendants set forth the protocol for such searches which are visual only, and involve no

20   touching.  (Doc. # 161 8 at ¶ 36.)  The Ninth Circuit has held that such searches are

21   constitutional. *See Bell*, 441 U.S. at 558-60; *Michenfelder*, 860 F.2d at 332.  Plaintiff's claim

22   hinges on the fact that the search was conducted on the tier, in view of other inmates and staff.

23   Plaintiff argues that the strip searches could have been conducted in alternative areas which

24   would have provided more privacy. Unclothed body searches prior to and after transportation

25   are usually conducted in the receiving area of the LCC property room, however, this area

26   cannot physically accommodate a full transport bus of inmates. (Doc. # 161 Ex. M at ¶¶ 14-

27   16.) Therefore, the searches are conducted on the tier to provide adequate space to search all

28                                              20

inmates departing the institution.  (*Id*.  at ¶ 17.)  This also aids in preventing the passage of contraband from unsearched inmates to inmates who have been searched.  (*Id*.  at ¶ 18.)  In addition, inmates in large groups are searched on the tier to have gun coverage for additional security because the officers conducting the searches are significantly outnumbered by the inmates being searched and transported.  (*Id*.  at ¶¶ 12-13.)

In addition, Plaintiff alleges that the search was unreasonable because a female transportation officer was present on the tier during the strip search.  (Doc. # 21 44-45.)  Plaintiff does not allege that the female officer conducted the strip search; only that she was standing off to the side.  (Doc. # 161 Ex. B at 116:11-19.)  Plaintiff does not specifically address the presence of the female transportation officer in his opposition to Defendants' motion for summary judgment.  (Doc. # 168 7-8, 44-48.)

In *Michenfelder*, the Ninth Circuit found that female officers may observe unclothed male inmates in their cells and in the showers. *Michenfelder*, 860 F.2d at 334.  In *Grummett v. Rushen*, the Ninth Circuit found that female officers may conduct pat-down searches, which include the groin area, of fully clothed male inmates.  *Grummett v.  Rushen*, 779 F.2d 491, 495-96 (9th Cir.  1985).  There, the court held that the inmates did not "demonstrate[] that these restricted observations by members of the opposite sex are so degrading as to require intervention by this court."  *Id*.  at 495 (citations omitted).  Here, where Plaintiff admits the female transportation officer was merely present on the tier, off to the side of the location where the search was taking place, the court finds no reason to depart from this established precedent.

Recently, in *Byrd v.  Maricopa County Sheriff's Dept*., the Ninth Circuit held that a strip search of a male pretrial detainee by a female cadet was unreasonable in violation of the Fourth Amendment.  *Byrd*, 629 F.3d 1135, 2011 WL 13920 at * 5 (9th Cir. 2011).  *Byrd* is distinguished from the facts here because in *Byrd* the female cadet actually conducted the cross-gender strip search which involved "touch[ing the inmate's] inner and outer thighs, buttocks, and genital area with her latex-gloved hand through very thin boxer shorts."  *Byrd*,

21

629 F.3d 1135, 1011 WL 13920 at *6. *Byrd* distinguished *Grummett* by noting that female officers in *Grummett* were not assigned to positions in which they conducted the strip search and did not have intimate contact with the inmates' bodies. *Byrd*, 629 F.3d 1135, 2011 WL 13920 at *6. Here, the female officer was standing off to the side and was not conducting the search. Moreover, Plaintiff does not assert that the presence of the female officer was anything other than an isolated incident. Therefore, the court finds this case more akin to *Grummett* and *Michenfelder* than *Byrd*, and concludes that the mere presence of a female officer on the tier did not violate Plaintiff's Fourth Amendment rights.

The court is required to give deference to the expert judgment of prison officials. *Bell*, 441 U.S. at 540 n. 23. In the absence of substantial evidence that the officials have exaggerated their response to the security and operations conditions present with the depopulation search in May 2006, the court is not willing to question Defendants' judgment that the conditions required the searches to be conducted on the tier to effectuate an orderly exchange of inmates, protect the safety of the officers conducting the search, and prevent the exchange of contraband between inmates. Even taking the presence of the female on the tier into account, the court finds that the scope and manner of the search weigh in favor of a finding of reasonableness.

### ii. Justification

It is undisputed that the search took place during a depopulation involving the exchange of a large number of prisoners, which the court finds is a legitimate governmental security interest. Therefore, the justification for conducting the search weighs in favor of a determination of reasonableness.

### iii. Place

Plaintiff argues that the strip searches could have been conducted in a place with more privacy rather than on the tier, in view of other prisoners and staff. Defendants contend that inmates may be searched on the unit tier to have gun coverage by other officers stationed in the gun tower or control unit, which affords officers on the ground additional security because

they are significantly outnumbered by inmates during these types of searches.  (Doc. # 161 9 at ¶ 37, and Ex.  M at ¶¶ 12-13.)  In addition, Defendants assert that the LCC property room cannot accommodate a full transport bus of inmates as was the case in the May 2006 search.  (*Id*.  at ¶ 38, and Ex M at ¶¶ 14-16.)  According to Defendants, conducting searches on the tier provides adequate space to search all inmates departing or arriving and to prevent the passage of contraband between searched and unsearched inmates.  (Doc. # 161 at ¶ 39, Ex.  M at ¶¶ 17-18.)  During the 2006 depopulation, LCC inmates being transferred out had to be searched and ready for transport when the buses arrived to accommodate an orderly exchange of a large number of inmates.  (*Id*.  at ¶ 40, Ex.  M at ¶¶ 19 -20.)  Defendants contend that the alternatives posed by Plaintiff are not feasible because it would reduce the number of inmates that could be searched at any one time and would reduce the staffing of officers in and around the tier.  (Doc. # 161 Ex.  M at ¶ 22.)

An argument similar to Plaintiff's was rejected in *Thompson v.  Souza*, 111 F.3d 694, 701 (9th Cir.  1997) ("having the searches in an entirely separate area, as Thompson suggests, would potentially allow prisoners to discard contraband on the way to the separate area").  Here, like *Michenfelder* and *Thompson*, the court will not engage in second guessing Defendants' judgment that the security conditions at issue reasonably required the searches to be conducted on the tier.  *Michenfelder*, 860 F.2d at 333 ("[W]e will not question [prison officials'] judgment that conditions in [a prison unit] reasonably require searches outside the prisoners' cells in order to protect the safety of the officers conducting them."); *see also Thompson*, 111 F.3d at 697 (approving an intrusive strip search conducted in view of jeering inmates).  Therefore, this factor weighs in favor of finding the search reasonable.

In sum, the balance of the *Bell* factors weigh in favor of finding the search reasonable.

**b.  The *Turner* Factors**

The first *Turner* factor is whether there is a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it." *Turner*, 482 U.S. at 89 (internal quotation marks and citation omitted).  It is not disputed that the

23

1  prison had a legitimate need to initiate searches in order to effectuate the transfer of a large

2  number of inmates in the depopulation at LCC.

3      The second *Turner* factor, "whether there are alternative means of exercising the right

4  that remain open to prison inmates," does not apply to the Fourth Amendment claim. *See*

5  *Michenfelder v. Sumner*, 860 F.2d 328, 331 n. 1 (9th Cir. 1988) ("Not all four factors will be

6  relevant to each case...[T]he second *Turner* factor...is much more meaningful in the First

7  Amendment context than the fourth or eighth...").

8      The third *Turner* factor is "the impact accommodation of the asserted constitutional

9  right will have on guards and inmates, and on the allocation of prison resources generally."

10  *Turner*, 482 U.S. at 90.  There is no question that conducting searches in less public locations

11  would require additional officers, and may require transporting inmates to less public

12  locations in the prison.  This would also pose significant security risks to the prison guards

13  conducting the searches, and make it easier for inmates to facilitate the passage of contraband.

14      The fourth *Turner* factor is "the absence of ready alternatives [as] evidence of the

15  reasonableness of a prison regulation." *Turner*, 482 U.S. at 90.  While Plaintiff has presented

16  several alternative options, the court is not willing to second guess Defendants' judgment that

17  the security conditions required the searches to be conducted on the tier.

18      Accordingly, the court reaches the same conclusion under the *Turner* factors as it did

19  under the *Bell* factors.  Summary judgment should be granted as to Count IX.

20  **F.    COUNT X**

21      Plaintiff argues that Defendants Whorton, Skolnik, Cox, and Palmer violated his First

22  Amendment right of free speech by promulgating a policy precluding Plaintiff and others from

23  purchasing tapes and CDs containing an "explicit lyrics" label without legitimate penological

24  justification.  (Doc. # 168 49.)

25      The First Amendment states, in relevant part, "Congress shall make no law...abridging

26  the freedom of speech." U.S. Const.  amend.  I.  The Supreme Court has recognized that

27  "convicted prisoners do not forfeit all constitutional protections by reason of their conviction

28                                                      24

and confinement." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987).  Although prisoners retain First Amendment rights while incarcerated, the exercise of such rights is limited by the fact of confinement and the needs of the penal institution.  *See Bell v. Wolfish*, 441 U.S. 520, 545 (1979); *Prison Legal News v. Cook*, 238 F.3d 1145, 1149 (9th Cir.  2001). *Turner v.  Safely* sets forth the general test to determine whether a prison regulation that infringes on constitutional rights may be enforced.  *Turner v.  Safely*, 482 U.S. 78 (1987). "[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests."  *Turner*, 482 U.S. at 89.

Defendants do not argue that the regulation at issue is reasonably related to a legitimate penological interest under *Turner*.  Defendants only make a conclusory assertion that there is no evidence that they personally participated in the alleged constitutional violation.  (Doc. # 46.)  Defendants, as moving party, bear the burden of informing the court of the basis for their motion, together with *evidence* demonstrating the absence of any genuine issue of material fact.  *Celotex Corp.  v.  Catrett*, 477 U.S. 317, 323 (1986).  Defendants do not point to any evidence to support a finding of the absence of a genuine issue of material fact.  They do not provide declarations indicating that they did not establish, maintain, direct, permit or carry out a policy of prohibiting inmates from purchasing tapes or CDs with "explicit lyrics." They do not point to deposition testimony by Plaintiff or any admission that his claim is unsupported by evidence.  Nor do they point to discovery responses indicating the absence of evidence to support this claim.

On the other hand, Plaintiff establishes that Defendant Palmer responded to Plaintiff's first level grievance and affirmed the existence of this policy.  (Doc. # 168 49, *see also* Doc. # 21 Ex. 5.)  Plaintiff further establishes that Defendant Cox responded to the second level grievance by stating that inmate services was following the wishes of the directors in not allowing sales of these CDs.  (*Id*.)  Plaintiff asserts that the directors at that time were Whorton, Skolnik, and Cox, and Defendant Palmer was the warden who carried out the directors' policies at LCC.  (*Id*. at 49-50.)  Defendants do not deny their roles as described by

1   Plaintiff.   Defendant Skolnik acknowledges the policy in his response to Plaintiff's

2   interrogatories. (Doc. # 161 Ex. Q, response to Pl.'s Interrogatory No. 4.) Defendant Skolnik

3   also admits that during Defendant Whorton's tenure as director, NDOC had an official policy

4   defining "explicit lyrics" as it pertains to NDOC's ban on CDs/tapes bearing such a label. (Doc.

5   # 161 Ex. J, response to Pl.'s Request for Admission No. 8.)

6        Defendants fail to meet their burden of establishing the absence of a genuine issue of

7   material fact.  Therefore, summary judgment should be denied as to Count X.

8   **G.     COUNT XI**

9        Plaintiff argues that Defendants failed to pay him for his labor in the prison kitchen the

10  same as similarly situated inmates without legitimate reason, in violation of his equal

11  protection rights. (Doc. # 168 51.) Plaintiff argues that the rational basis standard applies to

12  this equal protection claim, and therefore he is not required to demonstrate that Defendants

13  intentionally discriminated against him based upon his membership in a protected class. (*Id.*)

14       Defendants argue that Plaintiff has not alleged Defendants intentionally discriminated

15  against him in connection with his claim that his equal protection rights were violated when

16  he was prevented from being paid for his job in the prison kitchen, in contrast with other

17  inmates. (Doc. # 161 26-27.)

18       Preliminarily, the court notes that "prisoners do not have a legal entitlement to

19  payment for their work." *Serra v. Lappin*, 600 F.3d 1191 (9th Cir. 2010) (citing *Stanley v.*

20  *Gonzales*, 476 F.3d 653, 660 (9th Cir. 2007)); *see also Piatt v. MacDougall*, 773 F.2d 1032,

21  1035 (9th Cir. 1985) (holding that the state does not deprive a prisoner of a constitutionally

22  protected liberty interest by forcing him to work without pay).  Plaintiff is not claiming that

23  he was paid less than any applicable statutes require, but instead that he was not paid

24  compared to similarly situated workers.  Plaintiff's claim is not based on intentional

25  discrimination against a protected class of which he is a member, but on discriminatory

26  treatment against him as an individual in comparison to the other similarly situated inmate

27  workers. A claim that an individual has been irrationally singled out may sometimes support

28                                             26

an equal protection claim under what is known as the "class-of-one theory." *Engquist v. Oregon Department of Agriculture*, 553 U.S. 591, 601-02 (2008); *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000). In *Engquist*, the Supreme Court held that the class-of-one theory is not applicable in the public employment context. *Engquist*, 553 U.S. at 598, 605. The Supreme Court pointed out that "employment decisions are quite often subjective and individualized, resting on a wide array of factors that are difficult to articulate and quantify" and "treating similarly situated individuals differently in the employment context is par for the course." *Id*. at 604. The Court went on to say, "[t]o treat employees differently is not to classify them in a way that raises equal protection concerns. Rather, it is simply to exercise the broad discretion that typically characterizes the employer-employee relationship." *Id*. at 605. Here, Plaintiff's pay level equates to a personnel decision and Plaintiff cannot constitutionalize what is an employee grievance simply because the employer is a state agency. *See id*. at 607-09.[4] Accordingly, summary judgment should be granted as to Count XI.

## IV. RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that the District Judge enter an Order **GRANTING IN PART** and **DENYING IN PART** Defendants' motion for summary judgment (Doc. # 161) as follows:

• Summary judgment should be **GRANTED** as to Count I;

• Summary judgment should be **GRANTED** as to Count II;

• Summary judgment should be **DENIED** as to Count III;

• Summary judgment should be **DENIED** as to Count IV;

• Summary judgment should be **DENIED** as to Count V;

•Summary judgment should be **GRANTED** as to Count VI;

• Summary judgment should be **GRANTED** as to Count VII;

---

[4]     The court sees no distinction between this case where Plaintiff is an inmate worker and *Engquist*, involving a civilian worker.

1    • Summary judgment should be **GRANTED** as to Count VIII;

2    • Summary judgment should be **GRANTED** as to Count IX;

3    • Summary judgment should be **DENIED** as to Count X;

4    • Summary judgment should be **GRANTED** as to Count XI.

5    The parties should be aware of the following:

6    1.    That they may file, pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule IB 3-2 of the

7    Local Rules of Practice, specific written objections to this Report and Recommendation within

8    fourteen (14) days of receipt.  These objections should be titled "Objections to Magistrate

9    Judge's Report and Recommendation" and should be accompanied by points and authorities

10   for consideration by the District Court.

11   2.    That this Report and Recommendation is not an appealable order and that any

12   notice of appeal pursuant to Rule 4(a)(1), Fed. R. App. P., should not be filed until entry of the

13   District Court's judgment.

14   DATED:   April 7, 2011.

15

16

17   _____
     UNITED STATES MAGISTRATE JUDGE

18

19

20

21

22

23

24

25

26

27

28